May it please the court, your honors, I'm Brian Krikorian for the appellant Richard Eilers, and I know this has been very well briefed, so I will try not to repeat too much of what's in the briefs. I'd like to focus the court primarily on the events in this case that occurred in January and February of 2006 that related to the actions of the plaintiff in this case, Kate Haze and Mr. Scott, in seizing the assets that were taken under the security agreement. And as we pointed out in our briefing, the original agreement between the parties, Mr. Eilers is not a debtor, he is the guarantor. And as a guarantor he has rights to proceed against the security or against the debtor, which was his company, but nonetheless he was not personally liable to either compel them to perform or to exonerate the debt. In this case, we had two partners who were 50-50. One was Mr. Allender, one was Mr. Eilers. In May of 2005, Mr. Scott, who is the creditor, discovers that his security agreement had lapped several months earlier. What he does is he goes back to only Mr. Allender and asks that he sign a new security agreement, and in that agreement he adds new security. He doesn't go to Mr. Eilers, who is the other 50% holder, he doesn't get permission from it, he doesn't get new consideration for that. Counsel, even if we were to agree with you that the security agreement addendum was improper for adding this new equipment, you made no objection to the commercial reasonableness of the sale, did you? The sale itself of the assets? Yes. We raised it in the brief that the court found no issue of fact towards that. No, no, no. I'm talking about at the time. Yes, they did. I believe they did. Mr. Scharf and Mr. Eilers had a long letter-writing campaign with Mr. Patterson, and in fact filed a lawsuit shortly after that for a conversion and all sorts of things. Eventually that lawsuit was just dismissed because at that point Mr. Scott had already sold everything. Mr. Scharf also objected to them selling the two items that weren't on the security agreement. But there's no – setting that aside, the proceeds from the sale were credited toward your client's debts, were they not? They were credited towards the debt. The debt. Correct. Which he was 50-50 responsible for. Correct. But he is not 50-50% responsible as a debtor. He's a guarantor. Guarantor, yes. Therefore, he has different rights. And I think that's really where I keep pointing back where I think the district court fell into that trap, is while you're a debtor, you got the credit. This is what I call the mulligan approach. I may have fallen down the same hole because that seemed perfectly logical to me. It seems logical, Your Honor, but I would point the court to the Mark Nelson case, which was the Mark Nelson Oil versus Grim Logging. In that case, the debtor – the guarantor was a principal of the company, and he had guaranteed the debt. And in that case, all the creditor did was assign the debt to another party. And I have a hard time understanding the rationale of the Oregon court in concluding that where the debt is simply assigned, that that somehow harms the guarantor. And, Your Honor, it may seem petty or trivial, but I think – It's not petty or trivial. I just don't understand the rationale. It seems – it seems – well, I guess when I say trivial, it may seem like, how does that harm the debtor or the guarantor just because someone else owns the debt? And I think what the court said was in that situation, Mr. Grim had done other things, like change his liability structure in response to other debtors assigning debts. When you assigned this debt and did not tell him, you cut off that right of him to anticipate how to protect himself. I think it's analogous and exactly on point here. In this case, it goes beyond that because we had the co-owner. Again, Your Honor, I – Your Honors, I should be arguing this case to a jury. I should not be arguing this case to this court. I should be pointing out these things to a jury and saying, you draw reasonable inferences from this to conclude that what Mr. Scott and Kate Hayes did was put my client in a greater risk. You reach that conclusion. And Mr. Asher and his firm would come up and argue the opposite. I think the problem is, is what the lower court did was just assume, fall into a trap, that this is just another debtor trying not to get – not pay a debt. And I don't think that's the case here when you really look at the facts. And I haven't even touched on – Well, let me ask you this because one of the distinguishing features with the Grimm logging case is that the Grimm logging actually had unburdened assets that it could have pledged in order to pay the fuel debt. What assets were not already burdened? In this case, Your Honor, there was about less than a dozen, I believe.  There was some heavy machinery that Mr. Scott had secured. Everything else was unsecured by him. Those assets were taken by Mr. Allender, put in Mr. Scott's truck, and driven over to the same buyer and sold for $20,000. As we point out in the record, just six months before, Mr. Scott, on his own volition, goes and gets an appraisal and has all the assets appraised at half a million. If you just take out his security interests, there was over $250,000 in assets left. Now, Mr. Allender, who coincidentally gets a job at Clearstream, who coincidentally never gets sued by Mr. Scott, who coincidentally provides the affidavits in support of their motion, he doesn't do anything. And the reality is, he sells those assets for $20,000 to Clearstream. And Mr. Eilers basically is left holding the back. Now, if my argument is you tell me that a jury can't draw an inference from that, that Mr. Allender and Mr. Scott collude together, Mr. Scott says to him, look, just help me out here, I won't go after you. And Mr. Eilers, he's got all the money, his wife's rich, she works, let's do it. That, again, Your Honor, I should be arguing this case to a trier of fact. I should not be submitting this on the papers. And unfortunately, in the Western District, we don't get oral argument. So I'm basically stuck trying to put everything into the record and then hope the judge understands the issues. And I think when you look, I mean, I've got a wealth of information that is not just speculation, Your Honor. And as I pointed out, Black's Law says inferences do not come from direct evidence sometimes. You have to look at the circumstantial evidence and you have to draw the inference from that. There are plenty of inferences here. The security agreement is just a fact. Your position is that a jury should have been given a jury instruction that would say the guarantee is discharged if there was some material increase in the risk caused by the actions taken. Is that right? Yes. If the actions taken by the creditor on his own or with the partner materially increased Mr. Eilers' risk as a guarantor. So you're basically saying you think there's a genuine issue of fact whether his risks were materially increased. I believe at a minimum there are. If not, it goes in our favor. That's what I would argue. But yes, I think there are issues of that. But isn't that the issue that we've got? Yes, I believe there are issues of that. But you really don't have to make a jury argument to us. No, I don't. But I believe there are issues of that. I don't blame you for however you want to argue your case. But all you have to persuade us is that there's an issue of fact that some of your judgment wasn't proper. And I believe getting to Justice Tolman's question, had Mr. Scott simply taken the material that was secured under the original security, UCC-1, and had left everything else, my client would have had other remedies. He could have sold, if he had sold them for $20,000 and $1, he would have been able to pay off $1 more than Mr. Allender did in collusion with Mr. Scott. If he had had those two pieces of equipment that Mr. Scott had taken that he converted, he would have been able to sell those. You cannot just say, well, you did get the benefit of that. Mr. Scott does not have a right to convert property and materially risk the guarantor's right to go after that asset. In your example, a $1 difference in the sale price would not seem like, to me at least, a material increase in the guarantor's risk. And that's probably a bad analogy. But in this case, we're talking, as I pointed out, I have evidence. The appraisal of the non-secured property was $250,000. I believe my client could have sold it for more than $20,000. We're talking a 10, 15, almost 12%, 120% difference. That's immense. And when you consider the facts that Mr. Allender got essentially a sweetheart deal, I think there are issues of fact as to whether Mr. Eiler's position was materially at risk. I'm out of time, so I'll let you go. You're out of time. If you want to plan for it, we'll give you one minute for rebuttal. Thank you very much, Your Honor. But one doesn't mean five. I won't. One minute, and that's it. Go ahead, counsel. May it please the Court, Adam Asher for Plaintiff Kate Pays and Tom Scott. We submit that the issue before the Court is, did plaintiff's conduct in exercising its remedies under the note materially increase defendant Eiler's risk as a guarantor, such as to discharge him? Can I interrupt you for just a second? Because I've been trying to, or I was thinking about asking this question of your opposing counsel didn't quite get a chance to do that. But let me ask you a very basic question. Under state law, did Mr. Allender have the authority to unilaterally grant an additional security interest as to those two milling machines that were not part of the original security agreement? That is a question defendant Eiler's has cited in an Oregon statute. Frankly, that wasn't argued in the summary judgment motion below, whether or not the shareholder had the authority, and the district court kind of glossed over it. But wouldn't you think that that's part of the element of the question about whether there was collusion? If Mr. Allender did not have authority to grant a security interest in those two additional pieces of equipment, wouldn't that be at least some circumstantial evidence as to whether or not there was collusion going on? I don't believe so. I think what the record shows is that at the time of the grant of this additional collateral, Eiler's had long left the company, and the only person that was operating the company was Allender. Is that right? I mean, wasn't this a corporation? It was a corporation. But Eiler's had stepped down from the day-to-day operations. Tom Scott went to him and said, may I have additional collateral? And he pledged that collateral. But in order for a corporation to act, don't you have to have authority from the board of directors and the board of directors elected by the shareholders? The shareholders are 50-50% shareholders. Without the consent of Eiler's, there would be no consent by the board of directors to grant additional security. Wouldn't that be the case? I think that there is a question there that there was no grant by the board of directors. Was Allender the CEO? My understanding of the record, and Mr. Kroger may be able to correct me, but he had stepped down from day-to-day operations. Prior to his departure, he was the president. I don't know if there was a formal resolution by them as to whether Allender was now the president at the time of the grant of additional security. But I think the important question there is, again, did the grant of additional collateral, did that increase defendant Eiler's risk as a guarantor? Let me ask you a question. Originally, when this property was sold by Scott and the prior corporation, the sale price was $460,000, as I recall. But then when it was sold by Mr. Allender to Clearstream, they recovered $137,000. That's a pretty significant difference in the value. And, by the way, that $137,000 included the two additional milling machines and all of the other equipment that had not originally been covered by the UCC under the security agreement. It is a difference, and the issue goes to whether or not the sale was commercially reasonable. Well, let me ask you, isn't there a difference between a sale for fair market value and a commercially reasonable sale? One being that's being done without compulsion, without a need to sell now, whereas a commercially reasonable sale under the UCC would be completely different. It's actually being sold under compulsion. It's being sold in a much shorter time frame without really having an opportunity to look for other willing purchasers. Isn't there a difference between those two? I'm not sure that there is, and it certainly wasn't briefed. I think the key issue is what was plaintiff to do, and it followed the Oregon statute. It gave notice. It had two independent appraisals. But that would be true with regards to the assets that were pledged, perhaps under the original UCC-1, and if, in fact, the seller had a vendor's lien. But with regards to assets that there was no authority to sell, wouldn't you expect that there might be a difference between the price recovered at a fair market value sale and a commercially reasonable sale? I don't think there's any evidence in the record that defendant Eilers could have sold that collateral at a higher price. He has suggested that he could, but there's no evidence, contrary evidence, other than the two appraisals that Tom Scott and plaintiffs obtained up to the value as to that collateral. But if we assume that they did not have the power to sell them in the first place, why is it incumbent upon Eilers to prove that they could have recovered more as opposed to your obligation to prove that they couldn't? Because, after all, that's how his obligation as a guarantor becomes an issue, because he says, well, look, if I would have had an opportunity to continue the business or to sell the equipment, I would not be now in this position where I'm being compelled to pony up all this additional money as a guarantor. I think the problem is that he had notice of the sale. Despite objecting, he never moved to restrain the sale. And the issue, as termed, is the lens of guarantor. The question is, did that increase his risk? And we contend that it didn't increase his risk. And on the issue of exoneration, nothing plaintiff did prevented Defendant Eilers to sue the company. There's two points. The contract itself provides that upon 30 days, if there's a default in payment, 30-day grace period passes. After that grace period, there is a default without notice. Defendant Eilers agreed to that term both as a shareholder of the debtor and as a guarantor. Second, the undisputed facts are is that Eilers left the company in spring 2005, knowing a departure agreement hadn't been finalized, knowing that Scott and Kate Pace had not agreed to release him from the guarantees unconditionally, and knowing that he might not be kept abreast of the financial condition of the company. He assumed that risk. And so he's made the argument in the brief that I wasn't given notice, and therefore I couldn't act against the company. But he assumed that risk. Let me get back to my question. I apologize. If you prevail on a cause of action or conversion, you're presumed to be entitled to nominal damages. Isn't that true? I assume so. And that could be $1. Isn't there a reason for that? Isn't there a reason that you shouldn't have converted the assets in the first place? And so regardless of any other damages that one might suffer, we're going to at least give you nominal damages, right? I would agree with that. You don't? I would agree with that proposition. Okay. So then getting back to Mr. Isler's position, that his position as a guarantor was jeopardized by selling these additional assets, if, in fact, it were true that Allender did not have the authority to pledge these additional assets and that Scott and Clearstream and Allender or whoever did not have authority to sell these assets at a commercially reasonable price, then you would say they converted the assets and therefore at a minimum Mr. Isler would be entitled to $1 recovery. And if he was entitled to $1 recovery, that would prove that in fact his position as a guarantor had been jeopardized. Wouldn't you agree with that? I would agree. Well, I think the legal standard is that it's a material increase in his risk. And I would argue under that kind of nominal damage that that is not a material increase. And the other key component here, and I've said it before, is that there's no evidence in the record that he could have gotten any more than Scott had gotten after the appraisal. So there's no evidence in the record that he could have done any better. I'd like just to move on to the main issue here, which I think is, what was the change in the contract, the material increase as a risk? And unlike the cases in Mark Nelson Oil Products and Marshall Wells, there's simply no change. What we have here, the conduct we have here, is the exercise of the default rights. We submit that's performance of the contract, not a change in the contract. And the other small point I'd make, I realize I'm running out of time, is they take issue with the district court's conclusion that plaintiffs, at the very least, had an unperfected security interest. We'll add a minute to your time because we're giving Mr. Krikorian an extra minute. Thank you. So we'll balance it out. First, I'd say the argument, again, is that he's making is, had KPAs not looked to this collateral, a defendant and I just could have looked to that collateral, and therefore reduced my obligation. And, again, our point is that's the result he alleges he was deprived of was actually realized. Granted, he didn't sell it, Scott did, but it was sold in a commercially reasonable manner, and the only evidence in the summary judgment record is that it was supported and it was sold in a commercially reasonable manner. The second point is the legal proposition that there was an unperfected or that there was no security agreement at all is simply not true. The original sales contract, there was a provision in there that said, sellers shall have a first position over the following assets. The sale agreement was signed by the debtor, signed by the guarantor, value was given. That, at a minimum, is enough to create a security agreement. Wouldn't he have had a vendor's lien in any event as to the sale of the original collateral? I believe so, yeah. So this isn't a case where there's this argument where there's this new security agreement. It simply happened that the original security agreement lapsed. He tried to re-perfect that by filing a new financing statement, but the lapse of that financing, the original financing statement, did not undo the entire security agreement. And circling back, and I'll wrap up with this, again, the two additional pieces of collateral, he's asked to be not looked at the lens of through a debtor, but rather as a guarantor. And so the key question here under Oregon law is, was his risk material increased by the sale of that collateral? Again, we submit the only evidence in the record was that it was sold in a commercially reasonable manner, and that the proceeds were applied to his debt, thus reducing his liability. And so for the following reasons, we request that the court affirm the district court's ruling. Thank you, counsel. Thank you, Your Honors. I will speak like a chipmunk to get under my one minute. I will ask, I would like to answer your question, Judge Benitez. It was argued in the lower court that Mr. Allender didn't have the authority, and we cited Oregon Statute 79.0203.2. And Oregon Statute, it's at page 28 of our brief, 60.531, that requires the full board of directors to pledge assets to the company. The other thing, I point to the court, the record excerpt, page 87, is an e-mail of June 10th from Mr. Scharf to Mr. Allender and his attorney saying, Mr. Eiler's resignation as officer, director, and employee would not be effective until all the documents were signed. And he hadn't long stepped down, as counsel argues. It had been a matter of weeks since they had done this. Can I ask you, counsel said there's nothing in the record indicating that there was a material impairment of Mr. Eiler's position because the assets were sold in a commercially reasonable manner. Can you address that issue for me? Can I go beyond my minute? You can go to the ends of time to answer any of the judge's questions. My answer to that is twofold. First of all, we cited a case in the reply, I think it was Douglas Oil, I'm not sure where, the guy went in and took the extra adding machine and the counterfeitable, and the court said you can't just convert, as your honor was pointing out, you can't just convert people's assets under color of law and get away with it. Now, the question, it begs the question, they took assets they were not entitled to and they refused to give them back and sold them. I'm, you're asking me to prove a negative. How could I prove I would have gotten a better result? This isn't a legal malpractice case. What would the appraisal? Well, the appraisal would, and then we turn to the other assets taken in Mr. Scott's truck that are $230,000 or more than were sold. So I think had Mr. Eiler's been given an opportunity, he believes he could have at least done better than what Mr. Allender and Mr. Scott did with the non-secured assets. And I'm out of time, so thank you, Your Honor. Thank you. We appreciate the excellent argument on both sides. So it looks like Seattle lawyers as well as Spokane lawyers know how to argue, so thanks. So K-Pays, that case shall be submitted, K-Pays v. Eilers. So we will adjourn until tomorrow morning. All rise.
judges: Benitez, Gould, Tallman